# CENTRAL NATIONAL BANK OF WASHINGTON CITY v. NATIONAL METROPOLITAN BANK OF WASHINGTON.

---

BANKS AND BANKING; EVIDENCE; TRIAL; REOPENING OF CASE; ABUSE OF DISCRETION; PAYMENT OF FORGED CHECK.

1. In an action by a bank against the last indorser of a check drawn on the bank by one of its depositors and paid by it, in which it appeared that the drawer of the check caused it to be delivered to an impostor, supposing her to be the person whose name she assumed, and the plaintiff afterwards, on the claim of the depositor that the indorsement of the payee was a forgery, paid him the amount of the check, the plaintiff by recognizing the right of the depositor to the return of the money as having been improperly paid to the party

receiving the check from him, takes his place, and is bound by whatever testimony would bind him had it refused his demand for payment and suit had been by him against the bank to recover the money under the forged indorsement of his check.

2. After the plaintiff has rested his case, a motion by him to reopen the case and allow him to introduce additional testimony is addressed to the sound discretion of the trial court, whose action will not be reviewed on appeal, where there has been no abuse of such discretion.

3. There is no abuse of the trial court's discretion in refusing to allow the plaintiff to reopen his case and call an additional witness, where the plaintiff had, on the day the case was called, opposed a postponement of the trial until a subsequent day, which was asked by the defendant, on the ground that the witness in question was a necessary witness and could not be in court on that day, and such witness was in consultation with counsel for the plaintiff before the case was called, but was not placed on the stand, and where the motion to reopen was not made until after the court had announced his reasons for granting the defendant's motion to direct a verdict, and was about to take such action.

4. As between two innocent persons, the one whose act was the cause of the loss should bear the consequences.

5. A party, in the course of a real-estate transaction with an impostor, a woman, believing her to be the person whose name she assumed, drew a check to her in such name, and delivered it to a broker who was interested in the transaction. The broker introduced the woman to a trust company and identified her as the person named as the payee in the check, and the trust company cashed it and paid her the money. The trust company, clearing through a bank, indorsed the check, expressly guaranteeing prior indorsements, as also did the bank. The check was paid by the bank upon which it was drawn, and that bank, upon being advised by the drawer that the signature of the payee was a forgery, paid him the amount of the check, and brought suit against the bank which was its immediate indorser to recover the amount of the check. *Held,* that a verdict was properly directed for the defendant, upon the ground that treating the action, as it should be, as one by the drawer of the check to recover the money as paid to the wrong person, it would be unreasonable and unjust to permit him to escape the natural consequences of his own neglect and mistake by holding the bank at fault for not making the complete inquiry that he ought to have made primarily, to ascertain if the person to whom he caused the check to be delivered was in fact the person whom he believed, and thus represented her to be.

No. 1847.   Submitted April 14, 1908.   Decided May 5, 1908.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, on a verdict directed by the court, in an action against the last indorser of a check.                                         *Affirmed.*

The COURT in the opinion stated the facts as follows:

The declaration of the Central National Bank alleged that, on March 17, 1905, one Wharton E. Lester, by his check, directed plaintiff, as his banker, to pay to the order of Mrs. A. E. McKnight the sum of $1,949.75. That said check was indorsed in the name of said A. E. McKnight to the Washington Loan & Trust Company, said company indorsed the said check to the defendant, the National Metropolitan Bank, and defendant, on March 18, 1905, indorsed the same to the plaintiff. That defendant guaranteed the genuineness of the prior indorsements, including that of A. E. McKnight. That plaintiff, relying on the guaranty of the defendant of the validity of said prior indorsements, paid the amount of same to defendant. That said check was never indorsed by Mrs. A. E. McKnight, payee therein, and the same is not her genuine signature, but a forgery. That plaintiff has, by reason of the same, lost the value of said check, which defendant refuses to pay, etc.

The check introduced in evidence is in ordinary form, executed by Wharton E. Lester on March 17, 1905, and directing the Central National Bank to pay to the order of Mrs. A. E. McKnight the sum of $1,949.75. It bears the indorsements, first, of Mrs. A. E. McKnight, second, the Washington Loan & Trust Co., third, National Metropolitan Citizen's Bank, the name of which has since been changed by dropping the word "Citizens." Both the last indorsements are followed by the words: "Prior indorsements guaranteed." The cashier of plaintiff testified that Wharton E. Lester, the drawer of the check, was a depositor with plaintiff; that the defendant's indorsement is genuine; that the check was received by plaintiff from the defendant, in the usual course of business, through the clearing house of said city of Washington, and was paid by it on the faith of de-

fendant's indorsement, without regard to the prior indorsements thereon, and charged to the account of said Lester. That thereafter said Lester advised plaintiff that the indorsement of the name of "Mrs. A. E. McKnight" was a forgery, and demanded the return of the money which had been charged to his account. That, acting upon said demand, plaintiff repaid the said sum to said Lester, and made demand on defendant for the payment of the same, under its guaranty of the prior indorsements on said check, which was refused.

Mrs. A. E. McKnight, called by the plaintiff, testified that that was her name, that she resides in the city of Washington and knows no other person of that name residing there or elsewhere. That the indorsement of her name on said check was not made by her or her authority; and that she had never seen the check until at the time of the trial of one Miss Puckett for forgery. That she had only a slight acquaintance with the said Puckett, and did not know said Lester.

Richard J. Marshall, called by the plaintiff, testified that he is an agent and loan broker. That he first saw the check at the office of Lester who received from the person now known as Miss Puckett a note for $2,000 secured by a trust deed. That Lester dealt with her as Mrs. A. E. McKnight. That the difference between the amount of the check and that of the note represented certain expenses of examination of title, etc., none of which went to Lester. That, at the time, witness and Lester supposed her to be Mrs. A. E. McKnight. That witness, at the request of the party, identified her as Mrs. A. E. McKnight at the office of the Washington Loan & Trust Company. That she indorsed the name of Mrs. A. E. McKnight on the check and received the money. That he supposed her to be Mrs. A. E. McKnight at the time. That the said Puckett had since been convicted of the forgery of said indorsement, and is now in the penitentiary.

Plaintiff rested, and the defendant moved the court to direct a verdict. After argument the court indicated that he was about to grant said motion. Thereupon plaintiff moved the court to reopen the case and permit plaintiff to call Lester as a witness. It appears, also, from the bill of exceptions, that the

court took the following facts into consideration: The case was at the foot of the assignment on the day it was called. Defendant requested postponement until the following Monday. Plaintiff objected to postponement on the ground that Lester was a necessary witness and could not be in court on Monday by reason of an engagement to try a case in another court. Lester had been at the trial table with plaintiff's counsel continuously, and in conference with them. He and said counsel engaged in a consultation, before the announcement was made closing the evidence, which the court believed had reference to the question of calling Lester as a witness. The application to call Lester was not made until the court had announced his reasons for granting defendant's motion, and was on the point of formally granting it. For these reasons, the court refused the motion to reopen the case, and instructed the jury that the evidence conclusively established that Lester intended that the woman who had indorsed the check in the name of "Mrs. A. E. McKnight" should cash the check and should get the money; "in short, that the indorsement on the back of the check of the name of 'Mrs. A. E. McKnight' in fact identified the person whom Mr. Lester intended to get the money, and that the person who got the money was the person whom he intended to get it, and that they should return a verdict for the defendant."

The bill of exceptions showing the foregoing concludes: "There was no evidence tending to show who were the parties to the deed of trust aforesaid; and no evidence tending to prove that the witness Mrs. A. E. McKnight was ever the owner of any real estate."


*Mr. E. C. Brandenbury* and *Mr. A. A. Birney* for the appellant.


*Mr. William F. Mattingly* and *Mr. John B. Larner* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The first assignment of error is founded on an exception taken to the admission of the evidence of the witness Marshall relating to the facts and circumstances surrounding the execution and delivery of the check to the supposed Mrs. McKnight, and the receipt of the money by her from the Washington Loan & Trust Company.  For reasons that will be apparent in the discussion of the main question in the case, we think this evidence was competent.  It is true that Lester was not a party to the action, but the plaintiff, having recognized his right to the return of the money, as having been improperly paid to the party receiving the check from him, has taken his place, and is bound by whatever would bind him had it refused his demand for repayment and the action had been by him against it to recover money paid under a forged indorsement of his check.

2. The motion to reopen the case for the purpose of introducing evidence was addressed to the sound discretion of the trial court.  While it would have been more satisfactory to have had evidence from Lester regarding the circumstances under which the check had been given, under our view of the point on which the case must be made to turn, we are not prepared to say that, under the circumstances disclosed in the bill of exceptions, there was an abuse of discretion by the court.

3. Unquestionably it is the duty of a bank to pay the money of its depositors to the person named in his check, and payment to a different person upon a forgery of the payee's name will not bind the drawer.  It is also true that the indorsement of a check or draft is a guaranty of the genuineness of prior indorsements thereof.            ·   ·

In our opinion, however, these principles, on which the appellant relies, are not sufficient for the determination of the question raised by the evidence in this case.  Nor is there any provision of the negotiable securities act, contained in our Code, which is intended to apply to and govern the particular facts and circumstances here disclosed.

It is clear that the transaction involving the loan of the money was between Lester and the party to whom the check was delivered. She did not profess to be the agent or representative of a real Mrs. McKnight, but that person herself. The transaction was with her under the assumed name, and the check was delivered to Marshall for her, and it was intended that she should receive the proceeds. Marshall, knowing that she was the person intended to receive the money, and believing her to be in fact named Mrs. A. E. McKnight, went to the Washington Loan & Trust Company, identified her, and saw her indorse her name and receive the money. The real Mrs. McKnight had nothing to do with the transaction, and had no interest in the check. Lester and Marshall were the victims of a fraud. What inquiry they may have made to determine the identity of the party, unfortunately, does not appear. Whatever it was they were the victims of deception. It was their act in accepting the woman as Mrs. McKnight and dealing with her under that name that enabled the deception to be practised upon the Washington Loan & Trust Company, which, under the law as contended for by the appellant, would be ultimately liable as the one accepting the indorsement of the supposed Mrs. McKnight, and guaranteeing it to the defendant. Regarding the plaintiff, by reason of its repayment to Lester, as standing in his place, the question is, whether the Washington Loan & Trust Company made itself liable to him through paying the check to the person shown to be the one intended by him to receive the money. In other words, was it its duty to go back of his acts and representations, and ascertain that the presenter of the check, who Lester intended should receive the money, was not the person he supposed her to be? This question has been answered in different ways. Some of the cases relied on by the appellant as answering it in the affirmative will first be reviewed.

*Tolman* v. *American Nat. Bank,* 22 R. I. 462, 463, 52 L. R. A. 877, 84 Am. St. Rep. 850, 48 Atl. 480, is directly in point. Louis Potter, representing himself to be Ernest A. Haskell, obtained a loan from the plaintiff giving him a note signed under his pretended name of Haskell, and receiving a check on defend-

ant payable to Haskell. Potter, indorsing the name of Haskell, obtained the money from defendant, who charged it to plaintiff's account. Dealing with the contention that the plaintiff intended the impostor to have the money, it was said: "Of what consequence is the intent of the drawer of the check when the direction is to pay the party named? He has the right to assume that the bank will pay to the party as directed. In this case the money was intended for Haskell, because his was the only name suggested. * * * It is a perversion of words to say that it was intended for Potter simply because he had fraudulently impersonated Haskell."

It was further said that the negotiable securities act also covered the question of defendant's liability for paying the money to the imposter upon forgery of the name of Haskell.

*Beattie* v. *National Bank,* 174 Ill. 571, 43 L.R.A. 654, 66 Am. St. Rep. 318, 51 N. E. 602, is not directly in point, but analogous. In that case a draft was made payable to George A. Bent when it should have been made to George P. Bent. It was mailed to George A. Bent, and came into the hands of a party by that name, who knew that the draft was not intended for him. He presented it at the bank, indorsed it, and obtained the money. This was held to constitute a forgery, and the bank was declared liable for payment to the wrong person.

*Atlanta Nat. Bank* v. *Burke,* 81 Ga. 597, 2 L.R.A. 96, 7 S. E. 738. In that case one Knapp forged his wife's name to a trust deed, and took a check payable to her on which he procured the money by forging her name. The case does not decide the question here, because the check was not payable to Knapp, but to his wife. He, at least, was not the person intended to have the money.

*Shipman* v. *Bank of State,* 126 N. Y. 318, 12 L.R.A. 791, 22 Am. St. Rep. 821, 27 N. E. 371. One Bedell was a confidential employee in charge of the money-lending department of Shipman's business. Dodge, the bookkeeper of Shipman, kept the account with the bank, in which they kept their money. Bedell made out a number of statements, as was his custom, showing money needed to advance on certain loans, for which

Dodge filled up the checks which were signed by a member of the firm.   Among these were twenty-seven checks, the payees of sixteen of which were fictitious.   Bedell forged the indorsements on these checks and obtained the money.   All but three of the checks were paid by the bank through the clearing house, and in each case without inquiry as to genuineness of the indorsements; the others were paid to Bedell.   The checks were returned to Shipman, who, later, discovered the fraud, tendered the checks back, and demanded payment.   The court found that the bank paid the checks without any inquiry as to the genuineness of the indorsements, in reliance upon the responsibility of the persons presenting them for payment, and not in reliance upon anything done or forborne by Shipman, except the fact that the checks had been drawn by them; and held the bank liable; in other words, it found that the loss was not due to the negligence of Shipman.

*Armstrong* v. *Pomeroy Nat. Bank,* 46 Ohio St. 512, 6 L.R.A. 625, 15 Am. St. Rep. 655, 22 N. E. 866.   There Grimes, professing to act for one Brown, obtained a check payable to Brown, and, indorsing Brown's name, obtained the money.   It seems there was no such person as Brown.   The check was not intended for Grimes, and he obtained the money by forging the name of the person for whom it was intended.

*Dodge* v. *National Exch. Bank,* 20 Ohio St. 234, 5 Am. Rep. 648.   Dodge, holding a certificate of indebtedness issued by a paymaster of the United States Army, indorsed the same in blank, and mailed it to Paymaster Bonister, in Cincinnati, for payment.   The letter was stolen and the certificate was presented to Bonister for payment.   He required indentification and the party did not return.   Thereafter it was presented to one Stryker, another paymaster, who asked for proof of identity. The party told him that he could have himself identified at the bank on which the check was to be drawn.   Stryker made out a check on a blank form, striking out the words "or bearer" and making the same payable to Frederick B. Dodge or order.   Inducing someone to identify him as Dodge, the party indorsed the check in the name of Dodge and received the money.   In an ac-

tion by Dodge against the bank, he was held entitled to recover. A serious question in the case, on which there was dissent, was whether Dodge had the right to maintain any action against the bank at all. In discussing a question relating to the failure to offer proof of the entire transaction, the majority of the court took occasion to say that the bank would have had the right to show that the person to whom the check had been delivered was, in fact, the person whom the drawer intended to designate by the name of Dodge. Had such proof been made, it would seem that the decision would have been different.

The following cases answer the question in a different manner: *Robertson* v. *Coleman,* 141 Mass. 231, 232, 55 Am. Rep. 471, 4 N. E. 619. In that case a person registered at a hotel in Boston by the name of Charles Barney. On the next day he took a stolen wagon and team to Coleman, who was an auctioneer, to sell for him, representing himself to be named Charles Barney. Before selling the property, Coleman learned by telegraph that Charles Barney, of Swanzey, was a reliable man, but took no other steps to ascertain that the seller was really Charles Barney. Having made the sale, he gave the party a check drawn to the order of Charles Barney. The hotel keeper took the check indorsed by the party as Charles Barney, paying him the amount of the same, less the bill due by him. It was held that payment to the party who was intended to receive the money on the check bound the drawer.

*Emporia Nat. Bank* v. *Shotwell,* 35 Kan. 360, 57 Am. Rep. 171, 11 Pac. 141. Application was made by mail for a loan on certain land the title to which was in one Daniel Guernsey, who formerly lived in Kansas, but had removed to Iowa. The application was signed "Daniel Guernsey." The title was passed, a note and mortgage were executed by the pretended Daniel Guernsey, and a check was sent to him for the amount of the loan. He indorsed it as "Daniel Guernsey" and obtained the money from the bank before the fraud was discovered. For the reason that the payment was made to the person for whom it was intended, the bank was held not to be liable as for the pay-

ment of it under a forged indorsement of the name of the designated payee.

*Land Title & T. Co.* v. *Northwestern Nat. Bank,* 196 Pa. 230, 50 L.R.A. 75, 79 Am. St. Rep. 717, 46 Atl. 420. A party giving his name as Ashley obtained the title papers of one Bissey, who owned a lot which he wished to sell, by pretending that he wanted to purchase the same. He went to a conveyancer, represented himself to be Bissey, showed the title paprs, and applied for a loan of $5,000 on the property. The conveyancer, believing him to be Bissey, negotiated a loan. The mortgagee, wishing title insurance from the Land Title & Trust Company, deposited the amount of the loan with it to be paid to the mortgagor when the mortgage should be executed. When ready for settlement, Ashley went to the office of the company with the conveyancer, who introduced him as Bissey. He executed the mortgage in that name, and received the company's check drawn on itself to the order of Herman S. Bissey. This check indorsed "Herman S. Bissey," was deposited in the North Western National Bank by a person who opened an account as C. B. Rogers, and was collected by the bank in due course of business and paid to Rogers. Whether Ashley and Rogers were the same person did not appear. The fraud was not discovered until about six months later, when the real Bissey received a notice to pay interest. All of the parties, save Ashley, and possibly Rogers who got the money, acted in good faith. The Title & Trust Company sued the bank, claiming that there had been a forgery by Ashley of the name of Bissey, and that it had paid the money on the guaranty of genuineness given by the bank's indorsement. The court, in denying the liability of the bank, gave its reasons as follows: "Generally a bank is not bound to know the signature of the indorser of a check, and, if it pays a check on a forged indorsement, it can recover the money of the party to whom it was paid, if it proceeds promptly on discovery of the fraud. This is upon the principle that the indorsement of a check is an implied warranty of the genuineness of the previous indorsements. But, in order that a bank may recover, it must appear that it has sustained a loss. If it can charge the payment to the account of

the depositor, it has lost nothing, and has no cause of action. The question is, then, the same, whether we consider the check as having been drawn by an ordinary depositor in the trust company, or as having been drawn, as it was, by the real-estate department of the company, on the banking department.  While, as between the bank and the trust company, as a banker, the former is bound by its implied warranty of the indorsement, still there is no cause of action unless the payment of the check was not, as against the drawer of the check, a good payment. The reason of the rule that, when a bank pays a depositor's check on a forged indorsement, or a raised check, it is held to have paid it out of its own funds, and cannot charge the payment to the depositor's account, is that there is an implied agreement by the bank with its depositor that it will not disburse the money standing to his credit, except on his order.  The rule applies where a check has been lost or stolen and the payee's name has afterwards been forged; but it does not protect a depositor who is in fault, as in intrusting a check to one who he has reason to suppose will make a fraudulent use of it, or in so carelessly filling up a check that it may readily be altered, or in issuing a check to a fictitious person.  It is confined to cases in which the depositor has done nothing to increase the risk of the bank.  It should not apply when the check is issued to one whom the drawer intends to designate as the payee:  First. Because in such a case the risk is not the ordinary risk assumed by the bank in its implied contract with its depositor, but a largely increased risk, as it follows that a check thus fraudulently obtained will be fraudulently used.  The bank is deprived of the protection afforded by the fact that a bona fide holder of a check will exercise care to preserve it from loss or theft, which are the ordinary risks.  There is thrown upon the bank the risk of antecedent fraud practised upon the drawer of the check, of which it has neither knowledge, nor means of knowledge.  Secondly. Because in such a case the intention with which the drawer issued the check has been carried out.  The person has been paid to whom he intended payment should be made.  There has been no mistake of fact, except the mistake which he made when he

issued the check, and the loss is due, not to the bank's error in failing to carry out his intention, but primarily to his own error, into which he was led by the deception previously practised upon him."

*United States* v. *National Exch. Bank,* 45 Fed. 163. In that case an impostor had come into possession of postoffice money orders payable to another person. By fraudulent representations, he induced a person to believe that he was the payee of the orders, and to identify him at the postoffice. The orders were taken up and a check given him on the bank payable to the payee named in the orders. The same person identified him at the bank, which cashed the·check that was indorsed with the same name, and charged the same to the account of the United States. In giving reasons for refusing recovery in an action by the United States against the bank, the court said: "The question for the bank is, 'For whom was this money intended by the drawer?'—and the name is but one means of determining that question.   *   *   *   It was the duty of the department to ascertain the true individual, and to pay to no one else. Without doubt the postmaster would have paid currency instead of a check, if he had had it in hand, rather than in bank. If he would not, it would be very good evidence of neglect to deliver a check to a party, and put it in his power to draw the money on a forged indorsement in circumstances where the postmaster would not have been satisfied to part with the cash. Allowing the drawer and drawee to be equally innocent, the loss should fall upon the one who, by his act, has been the occasion of the loss, which in this case, I think, was the department. Though there may have been no express negligence on the part of the officials of the postoffice, it was a mistake to deliver the check to a person not entitled to it, and that mistake has been the occasion of the loss.

"The postoffice officials had every reason to believe that the bank would pay upon the identification and proofs which had actually induced them to deliver the check. The fraud—the imposition—had been mainly accomplished when a check for the money was delivered to Schuman as the true payee named in

the money orders, and it does not seem to the court either just or legal, after all that had taken place, to shift the responsibility for the loss upon the bank.   Where both are innocent, and the loss must fall upon one, it should be upon the one who, in law, most essentially facilitated the fraud. *Stout* v. *Benoist,* 39 Mo. 281, 90 Am. Dec. 466.   So in respect to two persons equally innocent, where one is bound to acknowledge and act upon his own knowledge and the other has no means of knowledge, there seems to be no reason for burdening the latter with loss in exoneration of the former; or, if both are equally innocent and equally ignorant, the loss should remain where the chance of business has placed it."

We are of the opinion that the cases last mentioned express the true doctrine that should govern in such cases as this.   It is a principle of natural justice that, as between two innocent persons, the one whose act was the cause of the loss should bear the consequences.   As the transaction in this case began with Lester, it was his duty to use diligence to ascertain the identity of the party with whom he dealt.   Failing to make this discovery, he became the victim of a fraud.   The impostor having succeeded in this first and essential step in the practice of the fraud, the next was comparatively an easy one.   The bank had a right to believe that Lester had acted with full knowledge of the party to whom he gave the check for the money, and its duty to him was discharged when it satisfied itself that the payment was intended to be made to the party who presented it.   This information it obtained from Marshall, who was connected with the transaction in some way, and to whom Lester delivered the check, not for the real Mrs. McKnight, who had nothing to do with the transaction and with whom Lester was not acquainted, but for the perpetrator of the fraud, who he believed bore that name.   Marshall, in apparent good faith, knowing that the money was intended to be paid to her, and believing that her true name was given in the check, introduced her to the officers of the bank and enabled her to obtain the money.   What further inquiry was it reasonable for the bank to make under such circumstances?   Lester, having delivered the check to her in per-

fect good faith, would, no doubt, have performed the same service for her at her request, had Marshall not been present, or had it been inconvenient for him to perform it. Had Lester, himself, performed this service, he would clearly be estopped to question the payment; and we see no reason why his conduct which led Marshall to perform it should not have the same effect. The view that we have taken of the law of this case finds strong support in a carefully considered decision of the House of Lords in England. *Bank of England* v. *Vagliano Bros.* [1891] A. C. 107. In that case, a confidential clerk of Vagliano Brothers forged letters, purporting to inclose drafts on them from a foreign correspondent which he had also forged. Believing them to be genuine, the firm accepted the drafts, which were payable to the order of a firm doing business in Russia. The same clerk abstracted the drafts from the mail of the firm directed to the payees, forged the indorsements of the latter, and obtained the money from the bank with which the firm did a large business. The primary cause of the loss was the acceptance of the forged drafts by Vagliano Brothers. Some of the lords justices regarded the entry of the names of the foreign payees as equivalent to ordering payment to fictitious persons under the English negotiable securities act, but the substantial ground of the decision in favor of the bank was the negligence of Vagliano Brothers, which was held to be the inducing cause of the payment of the checks. Lord Chancellor Halsbury said, in the course of his opinion: "It seems to me that if all these circumstances acting upon and inducing the bankers to make the payments they did make, are acts which are the fault of the customer, it is the customer, and not the banker, who ought to bear the loss." (P. 117.) Lord Selborne (p. 123) after stating that a prima facie case is made by showing that the drafts had been paid to an unauthorized party, said there may be circumstances which answer this prima facie case. Among these is negligence on the customer's part. He then proceeded: "I think that a representation made directly to the banker by the customer upon a material point, untrue in fact, (though believed by the person who made it to be true), and on which the banker acted by pay-

ing money which he would not otherwise have paid, ought also to be an answer to that prima facie case."

Treating this case, as we must under the facts proved, as if the action was one by Lester to recover the money as paid to the wrong person, we think it would be unreasonable and unjust to permit him to escape the natural consequences of his own neglect or mistake, by holding the bank at fault for not making the complete inquiry that he ought to have made primarily to ascertain if the person to whom he gave the check was, in fact, the person whom he believed, and thus represented her to be.

We think the court was right in directing the verdict for the defendant, and the judgment will therefore be affirmed with costs.                                    *Affirmed.*